## Staunton

R. G. Pope, Trading and Doing Business as R. G. Pope Construction Company v. J. R. Overbay.

September 8, 1954.

Record No. 4232.

Present, Eggleston, Buchanan, Miller and Smith, JJ.

The opinion states the case.

*Stant & Roberts*, for the plaintiff in error.

*Francis W. Flannagan*, for the defendant in error.

Eggleston, J., delivered the opinion of the court.

J. R. Overbay, hereinafter called the plaintiff, filed a motion for judgment against R. G. Pope, trading as R. G.

Pope Construction Company, hereinafter called the defendant, to recover damages alleged to have been done to the plaintiff's property by the blasting operations of the defendant in his near-by limestone quarry. It was alleged that as the result of such blasting operations plaster and walls in the plaintiff's residence, garage and garage apartment had been cracked and damaged and that "large rocks" had been thrown onto the plaintiff's property. A further allegation of damage caused by "obnoxious odors" and dust from the quarry operation was abandoned at the trial and need not be discussed. The defendant denied that the alleged damage had resulted from the blasting in his quarry.

The court adopted the plaintiff's view that he was not required to prove negligence on the part of the defendant in the blasting operation, and the jury were instructed that if they should find from a preponderance of the evidence that the property of the plaintiff "was damaged by the blasting operations of defendant" they should find for the plaintiff. They were further instructed that in fixing the damage, if any, due the plaintiff, they should allow such sum as would "reasonably compensate" him for repairing the damage done by the "blasting operation," "plus a nominal amount for rocks thrown onto plaintiff's property" by the acts of the defendant. The jury rendered this verdict:

"We the jury find the plaintiff not entitled to recover damages to buildings from the Pope Construction Company due to their (*sic*) failure to establish the fact that the damage was caused by blasting.

"We the jury find the defendant negligent by not using due precaution to prevent the throwing of rock on defendant's (*sic*) property and award him the damage of One Dollar ($1.00)."

Upon plaintiff's motion the lower court set the verdict aside and entered a final judgment in his favor for $1,150, the order reciting that this amount "includes the sum of

"$11 nominal damages * * * for the trespass of defendant in allowing a stone to be thrown upon the premises of the plaintiff."

To review that judgment the present writ of error was awarded the defendant. The only assignment of error we need consider is that the evidence was sufficient to sustain the jury's verdict and that the lower court erred in setting it aside and in not entering judgment thereon.

The record shows that in October, 1951, the defendant began to quarry limestone at a site south of U. S. Highway No. 11, in the vicinity of Bristol. The nearest edge of the quarry was some 550 feet from the plaintiff's residence and garage. The quarry was opened by driving into the face of the limestone hill. Later the bottom layer of stone was removed to a depth of from 25 to 30 feet.

In the initial stages of the operation holes were drilled in the rock to a depth of 12 feet and seven or eight sticks of dynamite were loaded therein and detonated. Later holes 18 feet deep were drilled in the rock and loaded with from 15 to 16 sticks of dynamite. The maximum amount of explosive used in a single shot of these types was 550 pounds.

Beginning in October, 1952, and continuing through March, 1953, larger holes were drilled both in the sides and bottom of the quarry and larger amounts of dynamite were used. During January, February and March, 1953, there were successive blasts of from 500 to 750 pounds of such explosives, except in one instance, on different days. On January 13 successive shots of 550 and 700 pounds were discharged.

Throughout the entire operation there were frequent "pop shots" of small quantities of explosive employed to break up large boulders. The noise from these latter explosions was much greater than that resulting from the detonation of larger quantities of the explosive in the deeper holes.

The plaintiff's residence, built in 1940, is a one-story frame building on a concrete block foundation. It consists

of a living room, hall, dining room, kitchen, three bedrooms, bath, and basement. The interior walls are constructed of plasterboard covered with painted plaster. The garage, constructed in 1949, has walls of concrete blocks with a concrete footing and floor. The garage apartment is of wood construction, the interior walls being of plasterboard nailed directly to the studding.

Witnesses on behalf of the plaintiff testified that prior to the commencement of the quarry operation there were only one or two cracks in the plaster in the residence and no cracks in the foundation. The walls of the garage and garage apartment were likewise free of cracks and damage prior to the blasting, these witensses said. There was evidence on behalf of the plaintiff that the vibrations from the blasting operations caused numerous cracks in the plaster, a crack in the basement wall, and a broken windowpane in the residence. There was evidence of similar cracks in the plaster of the garage apartment and a crack in the foundation wall of the garage. Some of these items of damage were discovered shortly after the more violent explosions, the vibrations from which, witnesses said, were of such intensity as to rattle the dishes in the houses. A contractor estimated the cost of repairing this damage to be $1,736.

There was evidence that after one blast, on May 17, 1952, a piece of rock fell on the plaintiff's property but caused no damage.

The defendant filed a written record of the blasting done each day from December 29, 1952, to March 30, 1953, showing the type of shots and amount of explosive used in each instance. These ranged from "pot shots," in which small quantities of explosive were used, to larger blasts of from 500 to 750 pounds. This record shows that on January 13, 1953, successive shots of 550 and 700 pounds of dynamite were exploded. The plaintiff's wife described one of these as a "severe blast," which "jarred the door open,"

but there was no evidence of specific damage to the plaintiff's property from this blast. Indeed, the damage complained of seems to have been attributed to the earlier blasts when much smaller quantities of explosive were used. Some of the witnesses described an experimental blast of 700 pounds of explosive on the day before the trial as "one of the light ones," or "one of the weaker ones." Some described the "pot shots" "as just as heavy" as the explosions of January 13.

The defendant testified that in the light of his twenty-five years' experience in the quarrying business he was of opinion that in no single blast had he used a sufficient quantity of explosive to cause any damage to the plaintiff's property.

Joe Nelson, experienced as a "powder man" for more than twenty-five years and now employed in that capacity by the defendant, was of the same opinion. Indeed, he testified that 1,500 pounds of dynamite could be used in a single blast in the quarry without causing any damage to the plaintiff's property.

Harold H. White was called as an expert witness for the defendant. His business is concerned with explosions and their effect on near-by structures. He gave a detailed statement of his education, experience and qualifications, which included that of "consultant on vibration problems to the Atomic Energy Commission." He testified to an experiment on the day before the trial, when a charge of 700 pounds of dynamite was exploded in the quarry and the effect of the explosion was measured by a seismograph placed in the Overbay residence. This instrument, designed to measure the intensity of shock waves transmitted through the ground, measured the intensity of the vibration from that explosion at .0024 of an inch, which, he said, "is 33 times less than the minimum motion at which damage has been known to occur" from such a blast. He was of opinion that there were no "possible conceivable conditions" under

which 1,000 pounds of dynamite exploded at the quarry could have damaged the Overbay property.

A juror inquired of this witness whether repeated vibrations from a number of blasts might not have caused the damage. His reply was, "It would take 137 years blasting every day for it to have effect."

The plaintiff himself introduced, through White, Bulletin 442, issued by the United States Department of the Interior, Bureau of Mines, entitled "Seismic Effects of Quarry Blasting," and characterized by the witness as "the best authority we know of" on the subject.

This pamphlet recites that numerous experiments were made to determine the structural damage, if any, to buildings from blasting operations. According to tables compiled from such experiments, 700 to 800 pounds of dynamite may be exploded within 500 to 1,600 feet of buildings without causing damage to the plastering. The bulletin further records that, "For ordinary residential structures the vibration necessary to produce damage is much greater than that resulting from customary quarry blasts," and that "No damage resulted in any of the blasting operations investigated over the 5-year period, although hundreds of observations were made at about 30 quarries or mines." The bulletin details many other causes for the cracking of walls and ceilings usually attributed to blasting in near-by quarries. Among these are improper construction, settling, shrinkage, etc.

Eldon Dutton, the contractor who gave an estimate on the cost of repairing the damage to the plaintiff's residence and garage, agreed that cracks in walls and foundations may be caused by "settlement, contraction and expansion."

We do not agree with the contention of the plaintiff that the testimony of the defendant, his "powder man," Nelson, and his expert witness, White, all of whom expressed the opinion that the blasting operations had not caused the damage, was devoid of probative value. The credibility and weight of such testimony were for the jury. As has been

said, the bulletin put in evidence by the plaintiff himself supports the opinion of the defendant's witnesses. It was for the jury to say, in the light of all the evidence, whether the damage of which the plaintiff complains was attributable to vibrations from the defendant's blasting operations. Having decided the clear-cut issue in favor of the defendant, their verdict should not have been disturbed.

The judgment complained of will be reversed, the verdict of the jury reinstated, and final judgment entered thereon with costs to the defendant appellant. Code, §§ 14-176, 14-178.

*Reversed and final judgment.*